## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ZOFO BENJAMIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cv-00989-TWP-MG |
| | ) | |
| WEXFORD OF INDIANA LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant Wexford of Indiana, LLC's, ("Wexford")

Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 (Dkt. 67). Plaintiff

Zofo Benjamin ("Benjamin"), an Indiana Department of Correction ("IDOC") inmate, suffers from

chronic medical issues. In March 2020, he contracted an infection that resulted in hospitalization

and extensive treatment for several months. Benjamin filed this civil rights suit alleging that

Wexford violated his constitutional rights and was negligent in its dealings with his infection.[1]

For the reasons stated below, summary judgment is **granted in part and denied in part**.

## I. STANDARD OF REVIEW

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in

order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 587 (1986). Parties in a civil dispute may move for summary judgment, which

is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is

appropriate when there is no genuine dispute as to any of the material facts, and the moving party

---

[1] Benjamin also initially named Dr. John Nwannunu as a defendant. (*See* Dkt. 1.) The claims against Dr. Nwannunu were dismissed without prejudice pursuant to Fed. R. Civ. P. 4(m). (Dkt. 24.)

is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

## II.   FACTUAL BACKGROUND

Because Wexford has moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party [Benjamin] and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

### A.      The Parties

Benjamin is an IDOC inmate who at all relevant times was housed in the Annex at New Castle Correctional Facility ("New Castle").  He was born with only one kidney, and as a result, he suffers from chronic medical issues, including kidney stones and urinary tract infections ("UTI").  (Dkt. 76-1 at 3 (27);[2] Dkt. 67-1.)

In 2020, when the relevant events occurred, Wexford was the medical care provider that contracted with IDOC to provide medical care for inmates.  (Dkt. 76-3 at 2 (5).)  Benjamin could not identify a written policy of Wexford's that he believes is unconstitutional. Dkt. 67-5 at 16, 19.

### B.      Health Care Practices at the New Castle Annex

The New Castle Annex ("the Annex") is in a separate building from the main facility and houses approximately 500 inmates. (Dkt. 67-3 at 7.)  In the timeframe relevant to Benjamin's complaint, only one nurse would be on duty to serve up to 500 inmates.  *Id.*

Erica Jones ("Nurse Jones") worked at New Castle as a nurse from 2018 until March 2022, and was employed by both Wexford and its successor, Centurion Health.[3]  (Dkt. 76-3 at 2 (5).)  She affirmed that the Annex was chronically understaffed during her time there.  *Id.* at 14 (90).  Before her arrival in 2018 there were two nurses staffed to the Annex, but when she was there only one nurse would work at a time.  *Id.*  She observed that "the staffing amount didn't match the amount of care that we needed to have people for," and that the staffing shortage was the worst during the COVID-19 pandemic.  *Id.* at 13−14 (89−90).  Heather Davis ("Nurse Davis"), who

---

[2] Several of the excerpted deposition transcripts are formatted in the four pages per sheet format.  The Court will cite to the excerpted depositions by first stating the page number of the PDF with the page number of the deposition indicated in parentheses.

[3] Centurion Health became IDOC's healthcare provider on July 1, 2021. *See* Centurion, "Centurion Health Provides Correctional Health for Indiana Department of Correction," July 12, 2021, https://www.centurionmanagedcare.com/newsroom/centurion-to-partner-with-indiana-doc-to-provide-comprehensive-healthcare-services.html (last accessed Mar. 13, 2023).

worked night shifts, affirmed that a nurse was supposed to be in the Annex at night, but "[m]ost of the time that didn't happen because [medical staff] had to be in several other places in the facility," so she would only go to the Annex to distribute medications or if she was called for an emergency. (Dkt. 76-4 at 2 (9).)  To go from the main building at New Castle to the Annex was a five-to-ten-minute walk.  (Dkt. 76-11 at 7 (33).)

Wexford tried to hire more nurses, but interest was low and turnover was high due to the prison environment.  (Dkt. 76-3 at 13 (88−89).)  Because of the staffing shortage, Wexford used a temporary staffing agency to hire additional nurses.  *Id.* at 13 (87).  The nurses would come in for a short-term contract and would receive a "very quick training" with an overview of "the basic nursing needs and how to work our computer system for charting, where to find . . . medical supplies that you need, just the basics." *Id.* Wexford also hired ancillary staff like EMTs, phlebotomists, certified nursing assistants, and medical assistants as additional support staff.[4] (Dkt. 67-3 at 7−8.)

Inmates who need medical attention generally initiate the process by submitting a healthcare request form.  (Dkt. 67-3 at 22−23.)  The forms can be placed in a box or handed directly to a medical staff member.  *Id.*  Nurses are supposed to collect the healthcare request forms every day, and then medical staff reviews the forms, records them in a logbook, and directs them to the appropriate department for scheduling or prescription refills. *Id.* at 22−24; Dkt. 76-2 at 3. According to Wexford's contract with IDOC, inmates who submit healthcare request forms that report clinical symptoms "must be seen face to face within 24 hours."  (Dkt. 76-2 at 3.)  Although the healthcare request forms are supposed to be collected from the boxes daily, Nurse Jones

---

[4] It is not clear from the record if these staff were assigned to the Annex or were mostly in the main facility at New Castle.

observed that when the agency nurses worked, the forms were not getting picked up, possibly because the agency nurses were not trained to do so.  (Dkt. 76-3 at 13 (86−87).)

Nurse Jones also observed that during Wexford's tenure, there were problems with distributing medications from the pharmacy in a timely manner.  *Id.* at 11 (81−82).  She testified,

> I even offered Nikki [the nurse who ran the pharmacy] several times, if there's something I can do to help you guys in the pharmacy to try and get these medications processed quicker, because we all noticed, even outside of the pharmacy, that stuff was not getting filled and back out in a timely manner, and I offered several times to help with anything that I could. So, . . . I've said stuff to her and I also said stuff to management at the time.

*Id.* at 11−12 (81−82).  When the contract switched from Wexford to Centurion Health, Nurse Jones began working in the pharmacy.  *Id.* at 12 (82).  The transition was difficult, in part because the companies used different outside pharmacies to fill prescriptions and also because there was pressure to catch up due to "all the grievances that had been filed with the ombudsman and the hyperfocus, you know, attention we were getting on the pharmacy at that time from State." *Id.* at 12−13 (82−86). When Nurse Jones started in the pharmacy, "the pharmacy was already a very big mess, State was looking very hard at our pharmacy, they found 1,000, I think, healthcare requests all over the pharmacy[.]" *Id.* at 4 (19−20).

Importantly, neither party introduced any evidence that Wexford had a written policy or protocol pertaining to follow-up care after an inmate has received treatment at an outside hospital. According to Dr. Nwannunu, when an inmate returns from a hospital, their discharge orders are placed in the electronic record system, and the medical provider "follow[s] up on the orders that accompany them."  (Dkt. 67-2 at 12.)

## C.    Benjamin's Health Issues and Related Treatment

Benjamin suffers from frequent UTIs.  (Dkt. 76-3 at 9 (70).)  UTIs are usually diagnosed by conducting a urine dip, which is a test to look for white blood cells, blood, or nitrates in the

urine. (Dkt. 76-3 at 9 (71).) UTIs are typically treated with antibiotics. *Id.* at 9 (72). If left untreated, UTIs can cause kidney infections which can become septic and potentially fatal. *Id.* at 10 (74); Dkt. 76-11 at 4 (11).

### 1.   Initial Symptoms and Treatment at the Hospital

Around March 6, 2020, Benjamin started to notice blood in his urine and a bloody mucus coming out of his penis. (Dkt. 67-1 at 6[5]; Dkt. 76-1 at 3 (26, 29).) He informed custody staff that he was bleeding and in pain. (Dkt. 76-1 at 3 (28).) Custody staff contacted the on-duty nurse, Bill Smith ("Nurse Smith"), who said it was probably a kidney stone and that "you have so many pints of blood that you can lose until you die. [Benjamin will] be all right." *Id.*; Dkt. 67-1 at 6. Benjamin believed that Nurse Smith did not want to come to the Annex because it was at night, the nursing station in the Annex was unstaffed, and Nurse Smith did not want to walk from the other building to check on him. (Dkt. 76-1 at 3 (28).) No one came to see Benjamin that night. *Id.* at 3 (30).

On March 9, 2020, Benjamin's cellmate put a blanket on the floor because Benjamin could not climb up to his top bunk due to his pain. *Id.* The next time Benjamin had to urinate, his cellmate had to lift him and sit him on the toilet. *Id.* at 3 (31). Benjamin could not get back up and then fell to the floor and was unresponsive. *Id.* His cellmate summoned an officer, who called medical staff. *Id.* at 3 (31).

Nurse Davis went to Benjamin's cell at approximately 9:40 p.m. to check on him. (Dkt. 67-1 at 3.) She told Benjamin that they could not take him to the infirmary because they did not have a back board with straps to safely transport him. (Dkt. 76-1 at 4 (32).) Nurse Davis conducted a urine dip which was positive for blood and white blood cells. (Dkt. 67-1 at 3.) Nurse Davis reported that Benjamin was "in the fetal position with eyes closed tight" and that he told her that

---

[5] According to his medical records from March 10, 2020, Mr. Benjamin reported that his symptoms started on Friday. (Dkt. 67-1 at 6.) The Court takes judicial notice that March 6, 2020, was a Friday.

his body locks up when he has urinary issues, but it had not been this bad before. *Id.* Benjamin had a low-grade fever, an elevated pulse, and elevated blood pressure. *Id.* Nurse Davis contacted Dr. Falconer, who provided verbal orders for Benjamin to receive a shot of Toradol for pain and to start Augmentin, an antibiotic, and Flomax, a medication that relaxes the muscles to help someone urinate more comfortably. *Id.*; Dkt. 76-3 at 9 (72−73).

Benjamin testified that he received only the Toradol shot and one pill that he believed was an antibiotic, (Dkt. 76-1 at 5 (34, 36))[6]. He testified, "[T]hey said that they ordered something for me. But usually when they order something for you, you don't get it for three days, five days, or whatever." *Id.* at 5 (34).

On March 10, 2020, at approximately 4:00 p.m., custody staff called Nurse Jones because Benjamin had fallen off his bunk and could not get up. (Dkt. 67-1 at 6.) When she arrived, Benjamin was sitting with his back against the wall. *Id.* There was dark urine in the toilet. *Id.* Nurse Jones observed that Benjamin was "in tears, face very red, almost tremoring from the amount of pain he was in," and he reported he felt a lower back pain, prostate enlargement, and that he only had one kidney. *Id.* His blood pressure and pulse were very elevated. *Id.* Nurse Jones called Dr. Nwannunu, and he directed her to have Benjamin taken to an outside provider. *Id.* at 7.

Benjamin was taken to the emergency room of St. Vincent Anderson Regional Hospital around 5:00 p.m. (Dkt. 76-8 at 4.) While there, he had a CT scan, various blood tests, and a urinalysis. *Id.* at 5. He was given morphine, Zofran (an anti-nausea medicine), and IV fluids. *Id.* The CT scan was negative for kidney stones, and he was diagnosed with cystitis, which is

---

[6]   Nurse Davis' notes state that she was "able to give all of these [medications] at this time," (Dkt. 67-1 at 3), to Benjamin. But viewing the evidence in the light most favorable to Benjamin, the Court credits his testimony.

inflammation of the bladder that is usually caused by a UTI.[7]  (Dkt. 76-8 at 7.)  He was prescribed Keflex, an antibiotic, that he was supposed to take four times a day for seven days.  *Id.*  He was instructed to "follow up with urology within 1 week [and] take antibiotics as prescribed."  *Id.* at 8.  He was also "told to return to the Emergency Department immediately if symptoms worsened."  *Id.* at 10.  Benjamin was never taken to a urologist.

### 2.    Treatment in the Weeks after Benjamin's Return from the Hospital

Upon Benjamin's return to New Castle the evening of March 10, 2020, he was taken back to his cell in a wheelchair and was told that the doctor would see him to follow up.  (Dkt. 76-1 at 5 (37).)  The next day, on March 11, 2020, Dr. Nwannunu gave verbal orders for Benjamin to receive Tylenol # 3 for five days in addition to the antibiotics.  (Dkt. 67-1 at 47−48.)  A medication administration record reflects that 31 pills of Keflex were dispensed to Benjamin on March 12, 2020, likely for him to keep on person ("KOP") in his cell rather than needing to go to the medication line.  (Dkt. 76-7 at 8; Dkt. 76-3 at 6 (26).)  The record also shows that Benjamin was given a dose of two Tylenol # 3 tablets once on March 11, three times on March 12, 13, and 14, and twice on March 15, 2020, before being discontinued.  (Dkt. 76-7 at 19.)

Benjamin "felt awful" upon his return from the hospital.  (Dkt. 76-1 at 6 (41).)  He was still bleeding, had no appetite, and could not hold any food down.  *Id.*  On March 16, 2020, he filled out a health care request form labeled "urgent" in which he said that he went to the hospital for a bad UTI and had been recommended for a referral to a urologist.  (Dkt. 76-7 at 21.)  He did not receive his antibiotics until March 13, 2020, so he was still in extreme pain and requested additional Tylenol # 3 to help relieve the pain because his "UTI isn't cured."  *Id.*  Benjamin filed

---

[7]  *See* Mayo Clinic, "Cystitis," https://www.mayoclinic.org/diseases-conditions/cystitis/symptoms-causes/syc-20371306 (last visited Mar. 13, 2023).

another health care request form on March 17, 2020, again asking for Tylenol # 3 to be extended "until the antibiotics have a chance to work[.]" *Id.* at 22.

Benjamin saw Nurse Jessica Kenekham ("Nurse Kenekham") on March 17, 2020, for a nurse visit. (Dkt. 67-1 at 51.)  He reported that he continued to have painful urination with bleeding, had been unable to keep food down without vomiting, and had been feeling dizzy. *Id.* at 52.  His blood pressure was elevated. *Id.*  Nurse Kenekham referred him to the provider with "ASAP" as the recommended timeframe and encouraged Benjamin to increase his water intake. *Id.*

Benjamin filed another healthcare request form on March 20, 2020, stating that he was still in "extreme pain" when he urinates, and although his antibiotics had run out, he believed they did not work because he had vomited all of his food and antibiotics due to the severity of his pain. *Id.* at 53.

On March 22, 2020, Benjamin passed out in his cell and hit his head, splitting his forehead open. (Dkt. 76-1 at 8 (53); Dkt. 67-1 at 54.)  He woke up in the nurse's station in a wheelchair. (Dkt. 76-1 at 8 (53).)  He reported to Nurse Kenekham that he continued to have painful and bloody urination and that he believed his antibiotics had not been effective because he had vomited them up. (Dkt. 67-1 at 54−56.)  Nurse Kenekham contacted the on-duty nurse practitioner who provided a verbal order for Keflex, Augmentin, Flomax, Tylenol # 3, and Zofran. *Id.* at 55−56.  The nurse practitioner recommended that Benjamin be brought to the clinic to see him the following day. *Id.* at 56.  Benjamin did not see the nurse practitioner the following day. (Dkt. 68 at 6−7; Dkt. 77 at 10.)

Benjamin's medications were not distributed as they were prescribed.  He was supposed to receive Augmentin twice a day for three days, but he received seven doses over five days.

(Dkt. 76-7 at 18.)  He was to receive Tylenol #3 up to three times a day, but he received one dose on March 22, 2020, three on the 23rd and 24th, two on the 25th, and one on the 26th.  *Id*.  He was supposed to receive Keflex four times a day, but he received one dose on the 22nd, three doses on the 23rd, four doses on the 24th, and three on the 25th, before it was switched to KOP.  *Id.* at 8, 18.

On March 24, 2020, Benjamin submitted a grievance that detailed his difficulty in getting proper medical attention for his UTI and an encounter with Dr. Nwannunu:

> I had been passing kidney stones for some time, losing much blood, feeling extremely fatigue[d], dizzy, throwing up, unable to keep food down, and medications [and] antibiotics etc. The Anderson Hospital had found me having a severe infection within my urinary tract. The pain and lack of food I'm unable to digest has caused several black outs and falls causing additional injuries. Dr. John was notified by several nurses that he needs to see me a.s.a.p., however continued to refuse to the medical staff. Nurse Jones and nurse Martin continued to plea[d] my case asking if Dr. John at the very least to go lay eyes on me but yet again refused to evaluate my medical condition. The concern with the nurses is my blood pressure was very high showing a risk of a stroke level. For nine days no doctor would agree to see me as more issues would grow within every passing day.
>
> Today I was finally called to Doctor John's office. I was explained to tell him what lately has been going on. I tried to include my ongoing condition of hurting my head by passing of the kidney stones then blacking out. Dr. John immediately cut me off telling me he don't care of the head injury to 'man up' however the kidney is all he wanted to hear about. I then told him I can't eat and I been throwing up for days. He cut me off saying, 'I done told you that the kidney is all he wanted to hear about' then demanded me to leave. As a result I still had not been evaluated by exam(s) or hands on. This type of conduct by the Doctor had put me in more danger because I can't eat, sleep, or function.

Dkt. 76-9 at 14, 18; *see also id.* at 16−17 (grievance appeals describing informal encounter with Dr. Nwannunu in more detail).[8]  This grievance was ultimately sent to the Regional Manager for the Northern Region for Wexford.  *Id.* at 10−11.

---

[8] The encounter with Dr. Nwannunu was not documented in Benjamin's medical records as a provider visit.

On March 26, 2020, Benjamin submitted a healthcare request form complaining that since he passed out and hit his head, he had been suffering from vision issues. (Dkt. 76-7 at 16.) He submitted another healthcare request form on March 29, 2020, stating that this was his third request and noting that he had been experiencing dizzy spells and vision issues. *Id.* at 17. These forms were not responded to until April 6, 2020, when the responder wrote that Benjamin did not mention these issues when he had a provider visit on April 2, 2020. *Id.* at 16−17.

### 3.   <u>Benjamin's Treatment in April 2020</u>

The first documented provider visit Benjamin had after his return from St. Vincent Hospital took place at a chronic care visit with Dr. Nwannunu on April 2, 2020. (Dkt. 67-1 at 57.) Dr. Nwannunu wrote that Benjamin had issues with pain and blood with urination with the passage of a kidney stone. *Id.* Benjamin's physical examination was normal, and he reported that his painful urination had resolved. *Id.* at 59. Dr. Nwannunu told Benjamin to return as needed and discontinued his prescription for Flomax. *Id.*

Nurse Jones responded to Benjamin's healthcare requests concerning his dizziness on April 6, 2020. (Dkt. 67-1 at 59−60.) Though the medical record is characterized as a nurse visit, it is not clear if Nurse Jones actually saw Benjamin that day. Her comment states that Benjamin submitted two request forms complaining of dizziness, but he had not mentioned these issues during his April 2, 2020 visit with Dr. Nwannunu. *Id.* at 60. She wrote, "Reply sent to offender notifying him of this [and] advised him to submit a new HCRF if issues persist or worsen." *Id.* In response, Benjamin submitted another healthcare request form in which he stated that he tried to tell Dr. Nwannunu about his dizziness, but Dr. Nwannunu said he did not want to hear about it because he was only there for a chronic care visit. (Dkt. 76-7 at 15.)

11

Nurse Jones saw Benjamin on April 12, 2020 at sick call.  (Dkt. 67-1 at 64.)  Benjamin said that around March 28, 2020, after his antibiotics ended, he was experiencing dizziness, vertigo, and memory issues, but his urinary issues had been resolved.  *Id.*  She referred him to the provider.  *Id.*

Dr. Nwannunu saw Benjamin on April 21, 2020 to address his dizzy spells.  *Id.* 65−67. Dr. Nwannunu did not observe any head injury, and Benjamin's vitals were stable.  *Id.* Dr. Nwannunu diagnosed him with post-concussion syndrome, and the plan was to continue to monitor it and follow up in three weeks. *Id.* at 67. But no follow-up appointment for this issue was scheduled.

### 4.      Benjamin's Treatment in June and July 2020

Benjamin began to experience pain and blood in his urine again in late May.  (Dkt. 76-7 at 6.)  He submitted a healthcare request form on May 25, 2020, stating "I am passing blood again and throwing up all night.  I'm so sick[.] Please come and see me a-s-a-p."  *Id.*

On May 27, 2020, Benjamin submitted a grievance he labeled "EMERGENCY" in which he said that he passed out and his cellmate summoned custody staff.  (Dkt. 76-10 at 5.)  This grievance was reviewed by Wexford employee Stephanie Dorethy.  (Dkt. 76-10 at 13.) Custody staff called the nurse's station after they visited his cell and saw that he "wasn't faking and in real bad shape. (They physically observed [him] bleeding and incapacitated on the floor[.])"  *Id.*  When custody staff called the nurse to report his condition, the nurse responded that "[s]he wasn't going to walk all the way down to the Annex for someone peeing blood."  *Id.*  Custody staff periodically checked on him through that night.  *Id.*  Benjamin submitted another healthcare request form on May 28, 2020, requesting an urgent sick call because he was passing an excessive amount of blood in his urine and had fainted from the pain.  (Dkt. 76-7 at 7.)

12

The May 25 and May 28, 2020 healthcare request forms were not reviewed until June 2, 2020. (Dkt. 67-1 at 70.) Nurse Jones wrote in Benjamin's medical records that she had noticed that healthcare request forms were not being picked up recently, so she collected them and found the two request forms. *Id*. She saw Benjamin that day, and he reported severe pain when voiding urine, describing "it as a 'cutting' pain, like a cut 'with salt in it, like fire.'" *Id.* at 71. Benjamin reported he was reluctant to drink fluids because he had been vomiting. *Id.* Nurse Jones told Benjamin that she would try to get Dr. Nwannunu to see him when he came over to the unit that day. *Id.* She subsequently stopped Dr. Nwannunu "hoping he would see [Benjamin]" and the doctor immediately stated, "[S]end him up to the clinic if he is that sick." *Id.* Benjamin was escorted to the clinic and seen by Dr. Falconer, who prescribed antibiotics, Tylenol # 3, and Flomax. *Id.*

The medication administration record reflects that the Tylenol # 3 was dispensed beginning on June 3, while the KOP antibiotics and Flomax were not dispensed until June 4, 2020, two days after the visit with Nurse Jones. (Dkt. 76-7 at 4, 24.) It took eleven days from the onset of his symptoms until he received antibiotics.

Benjamin submitted another healthcare request form on June 8, 2020, in which he stated that he had completed his prescriptions, but his symptoms had not improved and his pain had migrated from his back to his urinary tract. *Id.* at 13. He requested to be examined or at least have his prescriptions extended. *Id.*

Benjamin was seen by Nurse Jones on June 11, 2020. (Dkt. 67-1 at 74.) At that time, she conducted a urine dip test, which showed that his urine was reddish orange with lots of sediment, and had a "stringy, mucus-like substance" that was pulled out onto the strip. *Id.* Nurse Jones

called Dr. Nwannunu, who suspected a kidney stone and ordered that Benjamin be taken to the infirmary to get fluids for hydration, start antibiotics, and provide medicine to control the pain. *Id.*

Benjamin was treated with IV fluids, antibiotics, and pain medication in the infirmary on June 11 and 12, 2020. *Id.* at 76, 82. Dr. Nwannunu ordered an ultrasound, which was negative for renal mass, calculi, and hydronephrosis. *Id.* at 86. Dr. Falconer discharged Benjamin back to his housing unit in the evening on June 12, 2020. *Id.*

As before, the medication administration record reflects that Benjamin did not receive his antibiotics as prescribed. (Dkt. 76-7 at 5.) Though he was supposed to receive three doses of Keflex a day, for a total of between 27 and 30 capsules, only 17 doses were provided. *Id.*

Benjamin submitted another healthcare request form on June 24, 2020 complaining of severe back pain that he believed was a kidney complication. *Id.* at 3. He was not seen until July 3, 2020, when he had a sick call visit. (Dkt. 67-1 at 91−92.) During that visit, he reported that his issues had resolved, and he was no longer experiencing pain. *Id.*

### 5.     Benjamin's Treatment in August 2020

Benjamin saw Nurse Jones on August 7, 2020 because he was experiencing pain in his scrotum that he attributed to his urinary/kidney issues for the past four months. *Id.* at 93. A urine test did not show any blood or white blood cells, and he was referred to the provider to address his scrotum pain. *Id.* at 94.

Benjamin was brought to the outpatient clinic on August 13, 2020 due to "cranberry colored urine and back pain." *Id.* at 95. Dr. Nwannunu ordered a Toradol shot for pain and that an IV be started. *Id.* at 95. The nurses attempted to insert the IV five times, but they were unable to do so because Benjamin was so dehydrated. *Id.* He was taken to the infirmary where the nurse practitioner was also unable to start an IV line. *Id.* Dr. Falconer ordered that Benjamin be admitted

into the infirmary and had an outside company called in to place the IV. *Id.* at 97−102. Benjamin was diagnosed with pyelonephritis, *i.e.* a kidney infection.[9] In the infirmary, he was monitored closely, treated with antibiotics that were administered through an IV, and provided pain medication as needed. *Id.* at 101−24. Dr. Falconer discharged Benjamin from the infirmary on August 21, 2020. *Id.* at 125. At that time, the plan was to continue Benjamin on oral antibiotics and follow up with the medical provider in one week. *Id.* at 125−29.

## III.   DISCUSSION

Defendants do not dispute that Benjamin suffered from an objectively serious medical condition. Benjamin alleges that Wexford was deliberately indifferent to his serious medical needs because they failed to provide adequate follow up care and medications after he was discharged from the hospital, and Wexford did not provide enough staff in the Annex to be able to adequately treat his medical issues. (Dkt. 1 at 14−15.) He also asserts a state law negligence claim against Wexford for failing to train and supervise their employees and/or agents and for failing to read healthcare request forms in a timely manner. *Id.* at 16. The Court will first address Benjamin's federal law claim, before turning to his state law claim.

### A.   *Monell* **Claim**

Benjamin does not allege that any individual medical professional was deliberately indifferent. Rather, he alleges that he suffered a constitutional injury because of Wexford's customs or practices related to (1) coordinating care after discharge and (2) providing adequate staffing to manage inmate care and the provision of prescription medication. Accordingly, his claim against Wexford may only proceed under the theory of liability outlined in *Monell v. Dept. of Social* Services, 436 U.S. 658 (1978).

---

[9] Mayo Clinic, "Kidney Infection," https://www.mayoclinic.org/diseases-conditions/kidney-infection/symptoms-causes/syc-20353387 (last visited Mar. 13, 2023).

Private corporations acting under color of state law—including those that contract with the state to provide essential services to prisoners—are treated as municipalities for purposes of Section 1983. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). Wexford cannot be held liable under the common-law theory of *respondeat* superior for its employees' actions. *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021).

To prevail on a claim against Wexford, Benjamin must first show that he was deprived of a federal right, and then he must show that the deprivation was caused by a Wexford custom or policy or failure to implement a needed policy. *Dean*, 18 F.4th at 235. As the Seventh Circuit has explained:

> There are at least three types of municipal action that may give rise to municipal liability under § 1983: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. Inaction, too, can give rise to liability in some instances if it reflects a conscious decision not to take action.

*Id*. Because Benjamin does not allege that an express policy is unconstitutional or that his injury was caused by a policymaker, his claim falls under category two.

Further, a "pivotal requirement" for any practice or custom claim is a showing of widespread constitutional violations. *See Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020). While it is not "impossible" for a plaintiff to demonstrate a widespread practice or custom with evidence limited to personal experience, "it is necessarily more difficult . . . because 'what is needed is evidence that there is a true municipal policy at issue, not a random event.'" *Id.* at 426−27 (quoting *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005)). "If a municipality's action is not facially unconstitutional, the plaintiff 'must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those

consequences." *Dean*, 18 F.4th at 235. "[C]*onsiderably more proof than the single incident will be necessary in every case* to establish both the requisite fault on the part of the municipality, and the causal connection between the policy and the constitutional deprivation." *Id.* (cleaned up) (emphasis in *Dean*).

### 1.   Constitutional Deprivation

Wexford first argues that Benjamin has failed to show that he suffered a constitutional deprivation. The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

Wexford concedes that Benjamin suffered from an objectively serious medical condition. (Dkt. 68 at 17, n.2.) To prove a constitutional deprivation, Benjamin must show that Wexford acted with deliberate indifference—that is, that through its policies, practices, or customs, it disregarded a serious risk to his health. *Dean*, 18 F.4th at 234−35. Deliberate indifference requires more than negligence or even objective recklessness. *Id.* at 241. Benjamin "must provide evidence that [Wexford] actually knew of and disregarded a substantial risk of harm." *Id.*

17

In its memorandum in support of its motion for summary judgment, Wexford divides Benjamin's care into three phases: first, the onset of his UTI that resulted in his transfer to the hospital and subsequent care at New Castle; second, the resurgence of his symptoms in June and July 2020; and third, the resurgence of his symptoms in August 2020, when he was admitted and treated in the infirmary at New Castle. (Dkt. 68 at 19–22.) The Court finds there are material disputes of fact with respect to the first and second phases, but that Wexford is entitled to summary judgment with respect to the third phase.

"A delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain." *Perez v. Fenoglio*, 792 F.3d 768, 777–78 (7th Cir. 2015). With respect to phases one and two, Benjamin has introduced evidence that medical staff was aware that he was in pain but delayed treatment because they did not want to walk from the main building at New Castle to the Annex. (Dkt. 76-1 at 3 (28) (Benjamin testifying that after onset of infection in March, Nurse Smith refused to come to the Annex and stated, "[Y]ou have so many pints of blood that you can lose until you die. You'll be alright."); Dkt. 76-10 at 5 (grievance alleging that nurse refused to check on an incapacitated Benjamin in May because "she wasn't going to walk all the way down to the Annex for someone peeing blood").) He has also introduced evidence—to be discussed more in the next section—that there were consistent delays in receiving both his antibiotics and pain medication that may have resulted in extending and exacerbating his infection and prolonging his pain.

Benjamin also introduced evidence from which a jury could infer that his medical providers were deliberately indifferent by persisting in an ineffective course of treatment during phases one and two. *Machicote v. Roethlisberger*, 969 F.3d 822, 828 (7th Cir. 2020). First, neither Dr. Nwannunu nor the other providers ever followed up with the recommendation that Benjamin see

a urologist, or that he return to the hospital if his symptoms worsened.  (Dkt. 76-8 at 8, 10); *see*

*Perez*, 792 F.3d at 778 ("Allegations that a prison official refused to follow the advice of a medical

specialist for a non-medical reason may at times constitute deliberate indifference.").  Dr.

Nwannunu also refused to listen to Benjamin's medical concerns about his dizziness in their

informal encounter on March 24, 2020, because the doctor only wanted to address his kidney-

related issues.  (Dkt. 76-9 at 14, 18.)  This could support an interference that—rather than being

concerned about his patient's ongoing complications from the UTI—Dr. Nwannunu "recklessly

ignored an inmate's serious medical condition." *Machicote*, 969 F.3d at 828.  Additionally, there

is evidence that medical professionals persisted in an ineffective course of treatment when they

continuously provided Benjamin oral antibiotics despite him informing them that he was

consistently vomiting.  *Id.*  For these reasons, there is a dispute of material respect as to whether

Benjamin suffered a constitutional deprivation during phases one and two.

There is no evidence, however, that Benjamin received constitutionally inadequate

treatment in August 2020, when he was admitted to the infirmary for eight days.  There, he was

provided with antibiotics via an IV and pain medication and was constantly monitored.  (Dkt. 67-

1 at 95−129.)  Accordingly, Wexford is entitled to summary judgment as to any claims related to

Benjamin's treatment in August 2020.

### 2.   Causation

The next question is whether Benjamin has introduced evidence from which a jury could

infer that his constitutional injury was caused by Wexford's policy, practice, or custom.

Benjamin's first claim is that Wexford lacked the policies and procedures necessary to

ensure adequate follow-up care after Benjamin returned from the hospital.  In *Glisson v. Indiana*

*Dep't of Corr.*, 849 F.3d 372, 382 (7th Cir. 2017), the Seventh Circuit concluded that failure to

19

establish protocols for the coordinated care of inmates with chronic illnesses could support a *Monell* claim because the need for coordinated care is obvious. A jury could similarly conclude that a lack of a protocol for inmates returning from the hospital was a policy of inaction that ignored an obvious risk of harm. When Benjamin went to St. Vincent, he was treated with morphine and an IV drip and prescribed antibiotics. His condition at that point was no doubt serious; the hospital advised him to return immediately if his symptoms worsened and recommended a consult with a urologist in a week. When he returned from the hospital, he was told that he would see a provider to discuss his follow-up care. But that did not happen. Dr. Nwannunu verbally ordered prescriptions for antibiotics and pain medication the day after his return, but he did not see him until April 2, 2020, nearly a month after his hospital visit. Also, the medications Dr. Nwannunu prescribed were delayed for several days, which prolonged Benjamin's pain and likely extended the course of his infection. Thus, there is a triable issue as it relates to the lack of protocol for inmates returning from a hospital visit.

Next, a jury could also conclude that Wexford's custom of understaffing the Annex caused a deprivation. To prove a custom claim like this, Benjamin "must show more than the deficiencies specific to his own experience[.]" *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016). He "must come forward with evidence that could allow a reasonable trier of fact to find systemic and gross deficiencies in staffing," though "[h]e need not present evidence that these systemic failings affected other specific inmates." *Id.* at 735 (internal citations omitted). Here, Benjamin has introduced evidence that inadequate staffing in the Annex created several problems. First, although there was supposed to be a nurse onsite at the Annex, this was not always the case, and twice nurses refused to assess Benjamin when he was in a serious state of distress because they did not want to walk over from the main building. Second, a jury could infer from Nurse Jones'

testimony that the delay in distributing prescription medications and the ensuing backlog was attributable to insufficient staffing.  Third, while Wexford tried to deal with the staffing issue by hiring medical professionals through temporary staffing agencies, Nurse Jones testified that she noticed that those nurses did not pick up healthcare request forms (perhaps due to a lack of training), and this resulted in delayed care for inmates in the Annex.

One example that shows the compounding effects of Wexford's understaffing is Benjamin's effort to procure treatment in May and June 2020. Although Benjamin began experiencing pain from an infection around May 25, 2020, a nurse refused to see him on May 27, 2020 because she did not want to walk to the Annex, his May 25 and May 28, 2020 healthcare request forms were not picked up until June 2, 2020, and he did not receive his prescription for that infection until June 4, 2020.  (Dkt. 76-7 at 6; Dkt. 76-10 at 5; Dkt. 67-1 at 70; and Dkt. 76-7 at 4, 24.)  A reasonable jury could conclude that this series of events shows a systemic breakdown in the provision of healthcare at New Castle—or at least in the Annex.

Finally, there is evidence from which a jury could infer that Wexford was aware of deficiencies with staffing and failed to act "with conscious disregard for the known or obvious risk of the deprivation." *Dean*, 18 F.4th at 236.  At least two of Benjamin's grievances were reviewed by Wexford staff members, including a regional manager who did not work at New Castle.  (Dkt. 76-9 at 10−11; Dkt. 76-10 at 13.)  And Nurse Jones testified that she spoke with pharmacy staff and supervisors regarding her concerns about the delays in the pharmacy and offered to help.  (Dkt. 76-3 at 11−12 (81−82).)  Moreover, a jury could find that the risk of constitutional injury due to Wexford's widespread practices and lack of policies was obvious and that Wexford failed to take reasonable steps to mitigate the risk.

For these reasons, Wexford's motion for summary judgment is **denied** as to Benjamin's *Monell* claims, except as they relate to his treatment in August 2020 because he failed to show a constitutional deprivation for his treatment for that timeframe.

**B.    State Law Negligence Claims**

The Court turns to Benjamin's medical negligence claims.  The Court must apply Indiana law by doing its "best to predict how the Indiana Supreme Court would decide" the issues. *Webber v. Butner*, 923 F.3d 479, 482 (7th Cir. 2019).  An Indiana medical malpractice claim has "three elements: (1) a duty on the part of the defendant in relation to the plaintiff; (2) a failure [of the defendant] to conform his conduct to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff resulting from that failure." *Whitfield v. Wren*, 14 N.E.3d 792, 797 (Ind. Ct. App. 2014) (internal quotation marks and citation omitted).

Wexford provides one reason why it is entitled to summary judgment: Benjamin did not designate any expert testimony to establish the applicable standard of care. (Dkt. 68 at 24.) Expert testimony is usually required to establish a deviation from the standard of care in medical treatment in medical malpractice cases. *See Culbertson v. Mernitz*, 602 N.E.2d 98, 104 (Ind. 1992).  But expert testimony is not required "if no technical issues have to be resolved to determine whether there was malpractice." *Gipson v. United States*, 631 F.3d 448, 452 (7th Cir. 2011).  In *Gil v. Reed*, 381 F.3d 649, 661 (7th Cir. 2004), the Seventh Circuit observed, "It is within a layperson's purview to know that when a serious infection at the site of a surgical wound is diagnosed and an antibiotic is prescribed, failure to supply or delay in supplying the antibiotic can result in unnecessary pain, discomfort and a spreading of the infection."  Although Benjamin did not undergo surgery, he was a person with a single kidney who suffered from a UTI that required treatment with antibiotics.  He does not require expert testimony to show that

it was outside the standard of care to fail to timely provide him the prescribed doses of antibiotics. Wexford's motion for summary judgment is therefore also **denied** as to Benjamin's medical negligence claims.

## IV.  <u>CONCLUSION</u>

Wexford's Motion for Summary Judgment, Dkt. [67], is **GRANTED** as to Benjamin's *Monell* claim as it relates to the treatment he received in August 2020.  But a reasonable jury could find that Wexford was deliberately indifferent to Benjamin's serious medical condition. Because there are material disputes of fact with respect to whether Wexford's customs caused him a constitutional injury for his medical care from March 2020 through July 2020 and whether Wexford is liable for negligence, the Motion is otherwise **DENIED**.

This matter is set for trial on Monday, May 22, 2023. The parties must review the Final Pre-Trial Conference Order issued on February 24, 2023, (Dkt. 91), for all relevant deadlines to prepare for the Final Pre-trial Conference, scheduled for Wednesday, April 26, 2023.

The magistrate judge is asked to hold a settlement conference.

**SO ORDERED.**

Date: 3/16/2023

DISTRIBUTION:

Annemarie Alonso
SAEED & LITTLE LLP
annie@sllawfirm.com

Gabrielle Emilia Olshemski
SAEED & LITTLE LLP
gaby@sllawfirm.com

Jessica A. Wegg
SAEED & LITTLE LLP
jessica@sllawfirm.com

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

Jonathan Charles Little
SAEED & LITTLE LLP
jon@sllawfirm.com

Daniel J. Canon
CLAY DANIEL WALTON & ADAMS
dan@dancanonlaw.com

Bryan Findley
CASSIDAY SCHADE LLP
bfindley@cassiday.com

Joseph A. Panatera
CASSIDAY SCHADE LLP
jpanatera@cassiday.com

Magistrate Judge Mario Garcia